UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 26-00406-KK-SSCx** | Date: | February 5, 2026 |
|---|---|---|---|

Title:   ***Armen Akopovich Tsarukyan v. Kristi Noem et al.***

Present: The Honorable   KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE

| Dominique Carr | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   **(In Chambers) Order GRANTING Petitioner's Ex Parte Application for Temporary Restraining Order [Dkt. 5]**

**I.**
**INTRODUCTION**

On January 29, 2026, petitioner Arman Akopovich Tsarukyan ("Petitioner"), who is currently detained in the custody of Immigration and Customs Enforcement ("ICE"), filed a Petition for Writ of Habeas Corpus ("Petition") against respondents Kristi Noem, Pamela Bondi, Todd Lyons, Jaime Rios, Fereti Semaia, ICE, and the U.S. Department of Homeland Security ("Respondents").  ECF Docket No. ("Dkt.") 1, Petition ("Pet.").  On January 30, 2026, Petitioner filed the instant Ex Parte Application for Temporary Restraining Order ("Application"), seeking a temporary restraining order ("TRO") to order his immediate release from custody and to enjoin Respondents from re-detaining him absent compliance with ICE's internal regulations and due process.  Dkt. 5-1, Application ("App.").

The Court finds this matter appropriate for resolution without oral argument.  See Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.  For the reasons set forth below, Petitioner's Application is **GRANTED**.

**II.**
**BACKGROUND**

As alleged in the Petition, Petitioner was born in the former Soviet Union in 1970.  Pet. ¶ 32. In 1990, Petitioner entered the United States and subsequently became a lawful permanent resident. Id.

Sometime between 1990 and 2005, Petitioner was convicted of a crime and lost his lawful permanent resident status.  Id.  Petitioner was subsequently ordered removed to Russia on June 9, 2005.  Id.  Because Russia "refused to issue [Petitioner] a travel document," however, immigration authorities released Petitioner on an Order of Supervision ("OSUP") in 2005.  Id. ¶ 33.  After another unsuccessful attempt to remove Petitioner in 2011, Petitioner was released on another OSUP on February 14, 2011.  Id.

Since being released on his second OSUP, Petitioner's life "has changed for the better."  Id. ¶ 34.  Petitioner married his United States-citizen wife in 2011 and has two United States-citizen teenage sons whom he supports and actively parents.  Id.  Further, Petitioner has fully complied with his terms of release, has no new criminal history, and has only missed one appointment due to a medical emergency.  Id. ¶ 35.

On January 12, 2026, while appearing for an ICE check-in, Petitioner was informed that his OSUP was being revoked and that he would be detained.  Id. ¶ 36.  Petitioner was not given written notice explaining why he was being detained nor provided an interview where he could contest his detention.  Id.  ICE only told Petitioner they were "attempting to obtain travel documents for him," despite Russian authorities' previous refusal to produce travel documents for him in 2005.  Id. Petitioner was transported to the Adelanto ICE Processing Center ("Adelanto ICE") where he remains.  Dkt. 1-1, Declaration of Armen A. Tsarukyan ("Tsarukyan Decl.") ¶ 10.

Petitioner's health has declined since being detained at Adelanto ICE, and he has "suffered a heart attack."  Pet. ¶ 37.  Before his heart attack, Petitioner "kept telling" ICE officials he felt "very uncomfortable" during intake and showed them "how blue [his] arms were."  Tsarukyan Decl. ¶ 10. Petitioner later "awoke in a hospital" and was transferred back to Adelanto ICE.  Pet. ¶ 37.  Since that time, Petitioner has been denied his prescribed high blood pressure medication, leaving him without a "choice" to take "other medication" provided by ICE.  Tsarukyan Decl. ¶ 11; see also Pet. ¶ 38.  With the alternative medicine, Petitioner has not "see[n] any improvement in [his] health" and has sustained IV bruises on his arm from ICE's failed attempts to treat him.  Tsarukyan Decl. ¶ 11. Petitioner now "has little appetite, has back and leg pain, gets very little sleep, and feels very weak." Pet. ¶ 38.

On January 29, 2026, Petitioner filed the operative Petition against Respondents, raising the following grounds for relief:

1.     **Ground One:**  Unlawful Revocation of Release;
2.     **Ground Two:**  Violation of the Procedures for Revocation of Release; and
3.     **Ground Three:**  Unlawful Detention Without Individualized Determinations of
        Danger of Flight Risk.

Id. ¶¶ 39-51.

On January 30, 2026, Petitioner filed the instant Application, requesting a temporary restraining order immediately releasing him from ICE detention and enjoining Respondents from re-detaining him without a notice and hearing before a neutral factfinder.  App. at 6.  Petitioner argues his re-detention violates (1) the Due Process Clause of the Fifth Amendment ("Due Process

Clause"), (2) the Immigration and Nationality Act,[1] and (3) ICE's regulations governing revocation of release.  Id. at 10-13.

On February 3, 2026, Respondents filed an untimely Response to Petitioner's Application.[2] Dkt. 9, Reply.  In their Response, Respondents state, "At this time, Respondents do not have an opposition argument to present."  Id. at 2.

This matter, thus, stands submitted.

**III.**
**LEGAL STANDARD**

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.  See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001).  Under Federal Rule of Civil Procedure 65, the Court may grant a temporary restraining order to prevent "immediate and irreparable injury."  Fed. R. Civ. P. 65(b)(1).  Like a preliminary injunction, a temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).

The party seeking such relief must establish: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities weighs in its favor; and (4) the injunction is in the public interest ("Winter factors").  See id. at 20.  Courts in the Ninth Circuit also employ "an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the Winter standard."  Fraihat v. U.S. Immigr. & Customs Enf't, 16 F.4th 613, 635 (9th Cir. 2021) (citation modified).  Under the serious questions standard, the four Winter elements are "balanced, so that a stronger showing of one element may offset a weaker showing of another."  All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, a TRO may be warranted where there are "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff," and so long as the other Winter factors are also met.  Id. at 1132.

**IV.**
**THE WINTER FACTORS WEIGH IN FAVOR OF GRANTING THE TEMPORARY RESTRAINING ORDER**

**A.    LIKELIHOOD OF SUCCESS ON THE MERITS**

The likelihood of success on the merits is the most important Winter factor, which "is especially true for constitutional claims."  Junior Sports Mags. Inc. v. Bonta, 80 F.4th 1109, 1115 (9th Cir. 2023) (citing Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)).  Here, the Court finds Petitioner is likely to succeed on the merits or has at least raised "serious questions" regarding the merits of his claims.

---

[1] Because the Court finds Petitioner has satisfied the TRO standard under his APA and Due Process Clause arguments, the Court need not discuss this argument.

[2] On January 30, 2026, the Court ordered Respondents to file an Opposition to Petitioner's Application by 5:00 p.m. on February 2, 2026.  Dkt. 7.

1.      **Administrative Procedure Act**

a.      **Applicable Law**

"The legal proposition that agencies may be required to abide by certain internal policies is well-established."  <u>Alcaraz v. I.N.S.</u>, 384 F.3d 1150, 1162 (9th Cir. 2004).  Under the Administrative Procedure Act ("APA"), a court must "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right[;]" or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2).

8 U.S.C. § 1231(a) ("Section 1231(a)") governs the detention, release, and removal of noncitizens with an order of removal.  Under Section 1231(a), a noncitizen who has been ordered removed must be detained during the 90-day removal period.  8 U.S.C. § 1231(a)(1)(A), (2)(A).  However, if a noncitizen is not removed within this period, they must be released "subject to supervision under regulations prescribed by the Attorney General."  <u>Id.</u> § 1231(a)(3).  While certain noncitizens may be detained beyond the 90-day removal period, such noncitizens, if released, must be subject to the same terms of supervision as under Section 1231(a)(3).  <u>Id.</u> § 1231(a)(6).

8 C.F.R. § 241.4 ("Section 241.4") and 8 C.F.R. § 241.13 ("Section 241.13") set the terms of supervised release under Sections 1231(a)(3) and 1231(a)(6), including the conditions and procedures under which ICE may revoke release.[3]  8 C.F.R. §§ 241.4(l), 241.13(i).  First, ICE may revoke release when a noncitizen violates a condition of their OSUP.  <u>Id.</u> §§ 241.4(l)(1), 241.13(i)(1).  Second, ICE may revoke release when, "on account of changed circumstances, [ICE] determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future."  <u>Id.</u> § 241.13(i)(2).  Third, certain officials may exercise their discretion to revoke the release.  <u>Id.</u> § 241.4(l)(2).

Upon revocation of release, ICE must provide the noncitizen a copy of the decision "set[ting] forth the reasons for the continued detention."  <u>Id.</u> § 241.4(d).  Additionally, the noncitizen must be "notified of the reasons for revocation" and afforded "an initial informal interview promptly . . . to respond to the reasons for revocation stated in the notification," <u>id.</u> §§ 241.13(i)(3), 241.4(l)(1).

///

---

[3] Section 241.4 establishes conditions and procedures for the continued detention of noncitizens beyond the statutory 90-day removal period under Section 1231(a)(6).  <u>See</u> 8 C.F.R. § 241.4(a).  In comparison, Section 241.13 establishes special procedures for noncitizens "who are subject to a final order of removal and are detained under the custody review procedures provided at § 241.4 . . . where the [noncitizen] has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future."  <u>Id.</u> § 241.13(a).  While Petitioner primarily discusses Section 241.13 in his Petition and Application, Pet. ¶¶ 44-47; App. at 11, it is unclear under which, if any, authority Respondents have revoked Petitioner's OSUP.  Accordingly, the Court considers both provisions.

---

### b. Analysis

Petitioner claims Respondents violated the APA by failing to comply with the INA and its implementing regulations in re-detaining him. The Court finds Petitioner is likely to succeed on the merits of his APA claim.

First, it is undisputed Petitioner did not receive <u>any</u> notice of revocation upon his re-detention, let alone one "notif[ying] [him] of the reasons for revocation of his . . . release." 8 C.F.R. § 241.13(i)(3); <u>see also</u> <u>id.</u> § 241.4(d), (l)(1). Rather, upon being re-detained, ICE merely informed Petitioner he was being "placed back into immigration detention" and that "ICE was attempting to obtain travel documents for him." Pet. ¶ 36. Further, Petitioner still has not received a written explanation setting forth the reasons for his re-detention since he was re-detained over two months ago. Pet. ¶ 45; App. at 11.

Second, it is undisputed Petitioner did not receive an interview to challenge the revocation of release upon his re-detention. Pet. ¶ 45. Additionally, even if Petitioner was granted such an informal interview, ICE failed to provide adequate notice of the grounds for his re-detention and, therefore, "thwart[ed]" his ability to challenge his re-detention. <u>Santamaria Orellana v. Baker</u>, No. 25-1788-TDC, 2025 WL 2444087, at *6 (D. Md. Aug. 25, 2025). Thus, ICE denied Petitioner a meaningful "opportunity to respond to the reasons for revocation." 8 C.F.R. §§ 241.13(i)(3), 241.4(l)(1); <u>see also</u> <u>Tran v. Noem</u>, No.: 3:25-cv-02391-BTM-BLM, 2025 WL 3005347, at *3 (S.D. Cal. Oct. 27, 2025) ("In the stressful context of an [] arrest and revocation of release, in order to give effectual notice of the reasons for renewed detention, due process requires written notice so that the [noncitizen] can prepare for the post deprivation informal interview.").

Hence, Petitioner is likely to succeed on his claim that the revocation of his release and subsequent re-detention violated the INA's implementing regulations and, thereby, were "not in accordance with law" and "without observance of procedure required by law" in violation of the APA.[4] <u>See, e.g.</u>, <u>Delkash v. Noem</u>, No. EDCV 01675-HDV-AGRx, 2025 WL 2683988, at *6 (C.D. Cal. Aug. 28, 2025) ("These procedures are not optional or discretionary; they must be followed, and failure to do so renders the detention unlawful."); <u>M.S.L. v. Bostock</u>, No. 6:25-cv-01204-AA, 2025 WL 2430267, at *15 (D. Or. Aug. 21, 2025) (finding ICE's failure to follow its regulations in re-

---

[4] Even if Respondents provided Petitioner with sufficient notice and an opportunity to be heard, the Court is skeptical ICE can establish a proper reason for revoking Petitioner's OSUP. Here, Respondents do not dispute Petitioner has fully complied with the terms of his OSUP. <u>See</u> Pet. ¶ 33; 8 C.F.R. § 241.13(i)(1). Additionally, it does not appear "changed circumstances" make Petitioner's removal significantly likely in the reasonably foreseeable future in comparison to ICE's first failed attempt to remove Petitioner to Russia. 8 C.F.R. § 241.13(i)(2); <u>see also</u> <u>Sun v. Noem</u>, No. 3:25-CV-02433-CAB-MMP, 2025 WL 2800037, at *2 (S.D. Cal. Sep. 30, 2025) (noting Section 241.13 "place[s] the burden on ICE to show changed circumstances that make removal significantly likely in the reasonably foreseeable future"); <u>Nguyen v. Hyde</u>, 788 F. Supp. 3d 144, 150 (D. Mass. 2025) (noting Section 241.13 requires an "individualized determination" of changed circumstances). Because Respondents do not "show why obtaining a travel document is more likely," or even possible, "this time around," it is unlikely they can make the individualized determination of changed circumstances necessary to justify the revocation of Petitioner's release. <u>Hoac v. Becerra</u>, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *4-5 (E.D. Cal. July 16, 2025).

---

detaining the petitioner violated the APA); <u>Hoac v. Becerra</u>, No. 2:25-cv-01740-DC-JDP, 2025 WL
1993771, at *7 (E.D. Cal. July 16, 2025) (collecting cases in which courts find the petitioner's re-
detention unlawful because ICE failed to provide the required interview).

### 2.   Due Process Clause

#### a.   Applicable Law

Under the Due Process Clause, no person shall be "deprived of life, liberty, or property,
without due process of law."  U.S. Const. amend. V.  "Freedom from imprisonment . . . lies at the
heart of the liberty" protected by the Due Process Clause.  <u>Zadvydas v. Davis</u>, 533 U.S. 678, 690
(2001).  "[T]he Due Process Clause applies to all 'persons' within the United States," including
noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent."  <u>Id.</u> at 693.
As the Supreme Court recently reaffirmed, the Fifth Amendment "entitles [noncitizens] to due
process of law in the context of removal proceedings."  <u>A.A.R.P. v. Trump</u>, 605 U.S. 91, 94 (2025)
(citation modified) (quoting <u>Trump v. J.G.G.</u>, 604 U.S. 670, 673 (2025)).

"Due process is flexible and calls for such procedural protections as the particular situation
demands."  <u>United States v. Rivera-Valdes</u>, 157 F.4th 978, 991 (9th Cir. 2025) (citation modified)
(quoting <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)).  In general, due process "requires some
kind of a hearing before the State deprives a person of liberty or property."  <u>Shinault v. Hawks</u>, 782
F.3d 1053, 1058 (9th Cir. 2015) (citation modified) (quoting <u>Zinermon v. Burch</u>, 494 U.S. 113, 127
(1990)).  To determine "whether a pre-deprivation hearing is required and what specific procedures
must be employed at that hearing given the particularities of the deprivation," courts apply the three-
part balancing test established in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976).  <u>Yagman v. Garcetti</u>,
852 F.3d 859, 864 (9th Cir. 2017) (citation modified) (quoting <u>Shinault</u>, 782 F.3d at 1057).  Under
the <u>Mathews</u> test, courts consider "(1) the private interest affected; (2) the risk of erroneous
deprivation through the procedures used, and the value of additional procedural safeguards; and (3)
the government's interest, including the burdens of additional procedural requirements."  <u>Mathews</u>,
424 U.S. at 321.

#### b.   Analysis

Here, Petitioner claims Respondents violated the Due Process Clause.  App. at 10-13.  The
Court finds Petitioner is likely to succeed on or has at least raised serious questions regarding the
merits of his due process claim.

First, Petitioner has a substantial private interest in remaining out of immigration custody.
As a noncitizen residing within the United States, Petitioner is entitled to constitutional due process.
Further, as noted, Petitioner was released on an OSUP in 2005 following his initial ninety-day
detention in immigration custody.  Petitioner's release on supervision gave rise to "the most
elemental of liberty interests – the interest in being free from physical detention by one's own
government."  <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, 529 (2004); <u>see also</u> <u>Doe v. Becerra</u>, 787 F. Supp.
3d 1083, 1093 (E.D. Cal. 2025) ("Governmental actions may create a liberty interest entitled to the
protections of the Due Process Clause.").  Moreover, the fact Petitioner was previously "held in
custody by the government at an earlier time does not eliminate [his] liberty interest in remaining on
release."  <u>Valencia Zapata v. Kaiser</u>, 801 F. Supp. 3d 919, 932 (N.D. Cal. 2025) (citing <u>Morrissey</u>,
408 U.S. at 482).

Petitioner's release on an OSUP thus contained an "implicit promise that parole will be revoked only if he fails to live up to the parole conditions." Morrissey, 408 U.S. at 482; see also Pinchi v. Noem, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) ("[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody."). For over twenty years, Petitioner relied on this promise to "form the [] enduring attachments of normal life," such as establishing a family and becoming a caring, involved father. Morrissey, 408 U.S. at 482. Specifically, Petitioner parents two children along with his wife, encouraging his children to play sports and excel in school. Pet. ¶ 34. The length of Petitioner's release and compliance with two OSUPs for over twenty years further strengthen his private interest in his continued freedom from immigration detention. See Doe, 787 F. Supp. 3d at 1093 (finding the Government's actions in conditionally allowing the petitioner to live outside immigration custody for five years created a protected liberty interest); Pinchi, 792 F. Supp. 3d at 1034 (finding the more than two years a petitioner lived outside of immigration custody "heightened" her liberty interest). Hence, Petitioner establishes a significant liberty interest in remaining out of immigration custody.

Second, the risk of erroneous deprivation is significant without a pre-detention hearing. Civil immigration detention is "nonpunitive in purpose and effect" and is permissible only to reduce the risk of flight or danger to the community. Zadvydas, 533 U.S. at 690; see also Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017) ("[T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions."). In releasing Petitioner on OSUPs in 2005 and 2011, ICE necessarily determined Petitioner did not pose a significant flight risk or danger to the community twice. 8 C.F.R. § 241.4(d)(1) (authorizing release on an OSUP where the noncitizen "demonstrates to the satisfaction of the Attorney General or her designee that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such [noncitizen's] removal from the United States"); see also Sun v. Santacruz, No. EDCV 25-02198-JLS-JCx, 2025 WL 2730235, at *6 (C.D. Cal. Aug. 26, 2025) (noting a noncitizen's previous release on supervision reflects an implicit finding by ICE that the noncitizen "was neither a flight risk nor a danger to the community").

Respondents offer no evidence or argument showing anything has changed since Petitioner's release in 2011 such that Petitioner no longer meets these criteria. Indeed, the record suggests otherwise, as Petitioner has reported to ICE at periodic check-ins, maintained records of his check-ins, and complied with the terms of his OSUP as directed. Pet. ¶ 35. Further, Petitioner has no criminal history aside from his decades old conviction and was apprehended when he voluntarily appeared at the Los Angeles Field Office for a scheduled check-in. Id. ¶¶ 35-36. Finally, as noted, Petitioner has integrated himself into his community, where he embraces being a caring father and husband. Id. ¶ 34. The uncontroverted evidence thus "raises an inference that the government will have difficulty proving by clear and convincing evidence that Petitioner's detention is necessary to prevent danger to the community or his flight." Meneses v. Santacruz, No. CV 25-11206-MCS-PVCx, 2025 WL 3481771, at *4 (C.D. Cal. Dec. 2, 2025). Therefore, without the procedural safeguard of a pre-detention hearing, ICE may, as it appears to have done so here, revoke Petitioner's release and re-detain him "at any time," regardless of whether his detention serves any valid governmental purpose. See Pinchi, 792 F. Supp. 3d at 1035 (finding the risk of erroneous deprivation was significant where neither party "had an opportunity to determine whether there is

any valid basis for [the petitioner's] detention"); <u>Sun</u>, 2025 WL 2730235, at *6 (finding "post-detention safeguards are definitionally inappropriate to address the harm complained of here").

Third, Respondents – who do not oppose the Application – have no countervailing interest in re-detaining Petitioner, and the burden of a pre-detention hearing is low. "[A]s many other courts . . . have recognized, there is no meaningful countervailing government interest that supports detaining previously paroled noncitizens like petitioner without a pre-detention hearing." <u>Meneses</u>, 2025 WL 3481771, at *4 (collecting cases). As discussed above, Respondents do not show Petitioner poses a flight risk or danger to the community, especially considering Petitioner's lack of recent criminal history, compliance with his OSUPs, and other countervailing evidence in the record before the Court. Respondents provide no other reason for the revocation of Petitioner's release and Petitioner's ongoing re-detention. Thus, Respondents lacks any governmental interest in continuing to detain Petitioner. <u>See</u> <u>Pinchi</u>, 792 F. Supp. 3d at 1036 (finding no valid governmental interest where the government identified no changed circumstances regarding the petitioner's dangerousness or flight risk). Further, Respondents do not show a pre-detention hearing imposes a significant financial or administrative burden. To the contrary, custody hearings in immigration court are "routine" and impose only a "minimal" cost. <u>Singh v. Bowen</u>, No. EDCV 25-03034-CAS-PDx, 2025 WL 3251437, at *7 (C.D. Cal. Nov. 21, 2025) (citation modified) (quoting <u>Singh v. Andrews</u>, 803 F. Supp. 3d 1035, 1048 (E.D. Cal. 2025)). Hence, ICE's interest in Petitioner's continued detention is minimal.

Accordingly, because Petitioner is likely to succeed on the merits of his claim that his re-detention violates the Due Process Clause, the first and most important <u>Winter</u> factor weighs in favor of him, particularly in light of Respondents' failure to present an opposition argument. <u>See</u> Reply.

## B.    LIKELIHOOD OF IRREPARABLE HARM

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" <u>Hernandez</u>, 872 F.3d at 994 (citation modified) (quoting <u>Melendres</u>, 695 F.3d at 1002). "Deprivation of physical liberty by detention constitutes irreparable harm." <u>Arevalo v. Hennessy</u>, 882 F.3d 763, 767 (9th Cir. 2018) (citing <u>Hernandez</u>, 872 F.3d at 994). Among other harms, immigration detention results in "subpar medical and psychiatric care" for detainees and imposes "economic burdens" and "collateral harms" on the families of detainees. <u>Hernandez</u>, 872 F.3d at 995. "In the absence of an injunction, harms such as these will continue to occur needlessly on a daily basis." <u>Id.</u>

Here, as stated above, Petitioner's release has been improperly revoked, and Petitioner has been unlawfully detained in violation of his constitutional right to due process for close to one month. While re-detained at Adelanto ICE, Petitioner has suffered a heart attack and has been refused prescribed medications for his chronic high blood pressure. Tsarukyan Decl. ¶ 11. Hence, Petitioner and his family are – and will continue to be – irreparably harmed absent relief from this Court.

Accordingly, the second <u>Winter</u> factor weighs in favor of Petitioner.

*///*

## C.    BALANCE OF EQUITIES AND PUBLIC INTEREST

The final two <u>Winter</u> factors "merge when the Government is the opposing party." <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009).  The Ninth Circuit has recognized "neither equity nor the public's interest are furthered by allowing violations of federal law to continue." <u>Galvez v. Jaddou</u>, 52 F.4th 821, 832 (9th Cir. 2022) (affirming the balance of hardships weighed in favor of plaintiffs alleging the government violated the INA).

Here, because Petitioner has demonstrated a likelihood of success on his constitutional claim, the balance of equities and public interest "tip[] sharply" in his favor. <u>All. for the Wild Rockies</u>, 632 F.3d at 1135.  Moreover, Respondents' interest in enforcing immigration laws is not compelling because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." <u>Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.</u>, 594 U.S. 758, 766 (2021) (citing <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 582, 585-86 (1952)); <u>see also</u> <u>Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.</u>, 777 F. Supp. 3d 1039, 1045-46 (N.D. Cal. 2025), <u>appeal dismissed</u>, No. 25-2358, 2025 WL 1189827 (9th Cir. Apr. 18, 2025) ("[C]ourts regularly find that '[t]here is generally no public interest in the perpetuation of unlawful agency action.'" (quoting <u>League of Women Voters of U.S. v. Newby</u>, 838 F.3d 1, 12 (D.C. Cir. 2016))).  Faced with "a conflict between [administrative] concerns and preventable human suffering, [the Court has] little difficulty concluding that the balance of hardships tips decidedly in [Petitioner's] favor." <u>Hernandez</u>, 872 F.3d at 996.

Accordingly, the third and fourth <u>Winter</u> factors weigh in favor of Petitioner.

*    *    *

Thus, because all four <u>Winter</u> factors weigh in favor of Petitioner, Petitioner is entitled to injunctive relief in the form of immediate release from immigration custody.  As discussed above, Petitioner continues to suffer irreparable harm so long as he remains unlawfully re-detained.  <u>See</u> <u>Esmail v. Noem</u>, No. CV 25-08325-WLH-RAOx, 2025 WL 3030590, at *6 (C.D. Cal. Sep. 12, 2025) ("Providing Petitioner an interview <u>ex post</u> facto, while keeping him detained in ICE's custody, would not remedy the apparent constitutional violation that Petitioner has suffered in being re-detained without any measure of due process.").  Further, Petitioner's release is necessary to return him to the status quo, which is "the last uncontested status which preceded the pending controversy." <u>Flathead-Lolo-Bitterroot Citizen Task Force v. Montana</u>, 98 F.4th 1180, 1191 (9th Cir. 2024) (citation modified) (quoting <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1210 (9th Cir. 2000)).  Here, the last uncontested status is Petitioner's release on supervision before his current re-detention.  <u>See</u> <u>Domingo-Ros v. Archambeault</u>, No. 25-CV-1208-DMS-DEB, 2025 WL 1425558, at *2 (S.D. Cal. May 18, 2025) ("Petitioners seek a prohibitory injunction because they seek to preserve the status quo preceding this litigation—their physical presence in the United States free from detention.").

Finally, Respondents concede they "do not have an opposition argument to present." Reply at 2.  Accordingly, Petitioner's release from custody is the appropriate remedy.

///

///

# V.
# CONCLUSION

For the reasons set forth above, the Court orders as follows:

1.   Petitioner's Application is **GRANTED**;[5]
2.   Respondents are **ORDERED** to immediately release Petitioner from their custody;
3.   Respondents are **ENJOINED** from re-detaining Petitioner without providing him a pre-detention hearing before a neutral decisionmaker where Respondents bear the burden of demonstrating by clear and convincing evidence that Petitioner is a flight risk or a danger such that his physical custody is required;
4.   Respondents are **ORDERED** to file a status report no later than February 9, 2026, regarding their compliance with this Order; and
5.   Respondents are **ORDERED TO SHOW CAUSE** in writing **no later than seven (7) days from the date of this Order** why the Court should not issue a preliminary injunction. Petitioner may file a Reply **no later than ten (10) days from the date of this Order**.

Failure to comply with this Order will result in sanctions.

**IT IS SO ORDERED**.

---

[5] Federal Rule of Civil Procedure 65(c) permits a court to grant injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court 'with discretion as to the amount of security required, if any.'" Johnson v. Couturier, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis removed) (quoting Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003)). Here, it is unlikely Respondents will incur any significant costs, and requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." Baca v. Moreno Valley Unified Sch. Dist., 936 F. Supp. 719, 738 (C.D. Cal. 1996). Accordingly, the Court waives the bond requirement.